Case No. 19-5037-JGD

## AFFIDAVIT

I, Robert Jacobsen, Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives, being duly sworn, state as follows:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since November, 2017. I received 15 weeks of Criminal Investigator training at the Federal Law Enforcement Training Center and 17 weeks of ATF Special Agent training at the ATF National Academy.  I was trained in Federal criminal law, firearms, and criminal investigation techniques.

2.    Since joining ATF, I have investigated federal firearms violations which has included participating in the controlled purchases of firearms, surveillance of firearms traffickers, interviews of suspects, participating in search warrants, and electronic surveillance. I have investigated firearms trace data, classified advertisements, and online websites and forums in which firearms sales are facilitated.

3.    Prior to my employment with the ATF, I was employed for approximately two-and-a-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia.

For approximately the last year of that employment, I operated

as a member of the Special Operations Unit, a full-time SWAT

Team and Street Crimes Criminal Suppression Unit. I was trained

and certified by the Columbus Police Department as a SWAT

operator and hold numerous training certificates in domestic and

foreign weapon systems, street crimes, criminal narcotic

operations, and gang organizations. Prior to joining the Special

Operations Unit, I spent approximately one-and-a-half years in a

Patrol function, responding to public emergency calls for

service, investigating crimes, and testifying in court. I

graduated from the Northern Virginia Criminal Justice Academy

with Virginia state certifications as a Police Officer and Jail

Corrections Officer and received a Bachelor's of Science Degree

from George Mason University.

4.    As a result of my training and experience as an ATF

Special Agent, I am that it is a violation of Title 18, United

States Code, Section 922(g)(1), for any person who has been

convicted in a court of a crime punishable by imprisonment for a

term exceeding one year, to possess any firearm in or affecting

commerce, or to receive any firearm which has been shipped or

transported in interstate commerce. I am further aware that it

is a violation of Title 18, United States Code, Section

922(a)(1)(A) for any person not a licensed importer,

manufacturer and dealer under the provisions of Chapter 44 of

Title 18, United States Code, to willfully engage in the
business of dealing in firearms.

5.       I have personally participated in the investigation
of **MICHAEL LEBRON** and others since late spring 2018.  I am
familiar with the facts and circumstances of this investigation
based upon: (a) my personal knowledge and involvement in the
investigation; (b) my discussions with fellow agents and
officers who assisted in the investigation; (c) my interviews of
the prior (lawful) owners of firearms sold to **LEBRON** for what we
believe was resale here in Massachusetts; (d) my review of
Reports prepared by other ATF Agents; and (e) my experience and
training as a criminal investigator.  Because this affidavit is
being submitted for the limited purpose of establishing probable
cause for the requested warrants, I have not set forth every
fact learned during the course of the investigation.

<u>**INTRODUCTION**</u>

6.    I am submitting this affidavit in support of an
application for the issuance of a Search Warrant to be executed
at 40 Deckard Street, Apartment #2, in Boston, MA ("Target
Location #1").  As set forth below, this is believed to be the
residence of **LAKIM COLLINS**, and is more fully described in
Attachment 1 to this affidavit.

7.   As more fully described below, I assert that there is
probable cause to believe that **LAKIM COLLINS** is living at
Target Location #1. As is also described more fully below, I
assert there is probable cause to believe that evidence of
**LEBRON's** violations of the federal firearms laws exists at
Target Location #1, including but not limited to firearms and
ammunition once owned and sold by **LEBRON,** documentation
(including emails and text messages) regarding **LEBRON's**
unlawful purchase and sales of firearms, and other items as
described in Attachment 2 to this affidavit entitled
"Description of Evidence to be Searched and Seized."

## DESCRIPTION OF THE LOCATIONS TO BE SEARCHED

8.   The Target Location (40 Deckard Street, Apartment #2,
in Boston, Massachusetts) is described as follows:

### "TARGET LOCATION #1"

9. Target Location #1 is 40 Deckard Street, Apartment #2,
in Boston, Massachusetts. 40 Deckard Street, Apartment #2 is a
residential condominium unit on the second floor of a three (3)
story, three (3) family condominium building. It is located on
the right side of Deckard Street, a one-way street. Boston Latin
Academy is located across the street from 40 Deckard Street, on
the left. The building is made of red brick. There are two
concrete steps leading to the front door of the apartment

building. The front door is light brown with a clear glass
window in the center. The building number, "40," is located
above the front door to the building.

10. The apartment to be searched is Apartment #2, located
on the right side of the second floor. According to the City of
Boston assessing records, the unit is divided into a total of
five (5) rooms, including three (3) bedrooms, and one (1)
bathroom. Target Location #1 is more fully described in
Attachment 1 appended to this affidavit.

## FACTS

11.    The investigation into **MICHAEL LEBRON** was initiated in
late spring, 2018, when ATF recovered a firearm in Boston, MA.
The recovered firearm was a Glock 9mm semiautomatic. Based on its
serial number, the firearm's ownership was traced and agents were
able to track ownership of the firearm to John Mason, of
Manchester, New Hampshire.

12.    On August 21, 2018, ATF SA Daniel Campbell and I met
with Mason in Manchester, New Hampshire regarding the recovered
Glock. Mason works at the New Hampshire National Guard in and
is an active guard reservist who has been deployed twice to the
Middle East and anticipates being deployed a third time in the
next year. He fully cooperated with us and provided information
and documentation of his dealings with **LEBRON**.

13.  Mason described himself as a gun enthusiast who has purchased and sold numerous firearms over the years and who maintains documentation regarding such transactions.  Mason also stated that he had recently received a Federal Firearm's License and a Collector's License from ATF after applying for those licensees and being interviewed.

14. Mason explained that he sold the recovered Glock to **MICHAEL LEBRON** in a private sale through the website Armslist.com.  Mason stated that he had advertised multiple Glock firearms for sale through the website and was contacted via email by **LEBRON** on March 7, 2018, with **LEBRON** using the email address "MLBSOX9402@gmail.com".  Mason provided me with a copy of email communications between him and **LEBRON**, which indicated that **LEBRON's** emails were sent from an Apple iPhone.

15.  On April 5, 2018, Mason met with **LEBRON** at a Dunkin Donuts at 10 Eddy Road, Manchester, NH, where Mason sold **LEBRON** the recovered Glock and a second Glock firearm for $680.  During this purchase, Mason recalled that he asked to see **LEBRON's** driver's license and **LEBRON** showed him a New Hampshire driver's license prior to completing the sale.  Mason also remembered **LEBRON** to be driving a white Jeep SUV with New Hampshire license plates.

16.  On April 15, 2018, Mason was contacted by **LEBRON** again

via email through the website Armslist.com. **LEBRON** told Mason

that he loved the Glock firearms and asked if he had any more

of the same model for sale. Mason agreed to sell **LEBRON** another

Glock firearm for $350. Mason and **LEBRON** met again on April 15,

2018 at the same Dunkin Donuts, where Mason sold **LEBRON** a third

Glock firearm for $350.

17.    The next day (April 16, 2018), **LEBRON** contacted Mason again

via email inquiring about buying more firearms. **LEBRON** told Mason

that he wanted to purchase a Glock firearm for his dad and a

Glock for himself. Mason agreed to sell **LEBRON** two more Glock

firearms for $850. Prior to this sale, Mason explained to **LEBRON**

via email that he was going to take a picture of **LEBRON's**

driver's license for his records and asked if **LEBRON's** dad was a

New Hampshire resident. **LEBRON** told Mason that his dad was a

lifelong New Hampshire resident and agreed to have his driver's

license documented. Mason and **LEBRON** met again on the afternoon

of April 16, 2018, at the Dunkin Donuts where they had met twice

before, and Mason sold **LEBRON** two Glock firearms for $850.

18.    Mason documented the sales of all five (5) firearms he

sold to **LEBRON** on a Firearms Bill of Sale. **LEBRON** signed his

name as the buyer of all five (5) firearms and listed his

address as "26 Massabesic." **LEBRON** listed two (2) different

phone numbers ("603-233-6948" and "603-233-4908") on the

Firearms Bill of Sale. Mason also took a photograph of

LEBRON's New Hampshire driver's license and provided me with
a copy of the driver's license photo and the Firearms Bill of
Sale. Further investigation of LEBRON's driver's license
indicated that the license provided to Mason was a temporary
license that had expired as of February 26, 2018. According
to the New Hampshire Division of Motor Vehicles, prior to the
expiration of LEBRON's temporary license a new driver's
license was mailed to 26 Massabesic Street, Manchester, NH, and
was returned to sender. LEBRON's signature on the driver's license
appears to match the signatures on the Firearms Bill of Sale.
Mason also confirmed that LEBRON was driving a white Jeep SUV
during all three (3) of their meetings.

19. Record checks on LEBRON revealed him to have an active
Massachusetts Identification Card bearing the address of 547
Adams Street, Apartment #21, Boston, MA. LEBRON's
Massachusetts Board of Probation Records also list 547 Adams
Street Apartment 21 as his residence.

### LEBRON'S CRIMINAL HISTORY AND INTERSTATE NEXUS ISSUES

20. I have reviewed LEBRON's criminal record as maintained by
the Massachusetts Criminal History Systems Board. It reveals,
among other things, that LEBRON's residence is listed as 547
Adams Street Apartment #21 and that LEBRON was convicted in
2012 in Dorchester District Court on charges of Assault with a
Dangerous Weapon and Larceny from the Person. I have

determined these are both crimes punishable under
Massachusetts law by imprisonment for more than one (1) year
and therefore precluded **LEBRON** from both possessing a firearm
or ammunition that has been shipped or transported in
interstate commerce and from obtaining a federal license to
deal in firearms. Based upon my training and experience as an
ATF Agent who has conducted federal firearms investigations, I
also know that Glock firearms are manufactured outside of New
Hampshire and Massachusetts, meaning that the five (5) Glock
firearms purchased by **LEBRON** from Mason necessarily traveled
across state lines or international boundaries prior to being
sold to **LEBRON** by Mason.

### SEARCH WARRANT ON LEBRON'S RESIDENCE

21.   On September 26, 2018, I obtained a federal search
warrant for 547 Adams Street #21, Boston, Massachusetts, and
the White Jeep Cherokee bearing New Hampshire license plates
#4205186, the residence and vehicle of **LEBRON**.

22.   On September 27, 2018, I and other agents executed the
aforementioned search warrants. **LEBRON** was the sole occupant
inside of the residence during execution of the search warrant.
I read **LEBRON** his Miranda rights and he acknowledged his
understanding of those rights. **LEBRON** identified his bedroom
inside of the apartment and explained to agents that he had

ammunition inside of his bedroom.

23. Pursuant to the warrant, we seized 208 rounds of ammunition from a black bag located inside of the closet in the bedroom that he identified as being his. Among other items, firearm holsters and firearm accessories were also seized. Also pursuant to the warrant, the contents of LEBRON's cell phone was downloaded.

## LEBRON'S POST-ARREST STATEMENT

24. LEBRON agreed to speak with myself and other Agents inside of the apartment. In a post-Miranda interview, LEBRON explained that he had purchased, "north of ten" guns since February of 2018, though by the end of the interview acknowledged the number could be twenty or more as he did not remember exactly how many guns he had purchased. LEBRON described that all of his firearm purchases were made through armslist.com in New Hampshire, similar to classified ads where gun owners privately purchase, sell and trade firearms. LEBRON stated that he purchased firearms on armslist.com from at least ten (10) different people and the most that he has ever purchased in one transaction was two (2). LEBRON further explained that the most firearms he ever had in his possession at his residence was three (3) at one time and that all the firearms were purchased for resale in Massachusetts. Further investigation into LEBRON's claims and admissions revealed that relevant

details encapsulating his firearms purchases and sales were
omitted, and the amount of guns he had purchased and sold as
well as the amount of guns present in his possession at one
time, was minimized.

25.   LEBRON explained during the interview that he sold
firearms to a person named "Friz," from whom he had bought
marijuana in the past. LEBRON told Agents that he sold nearly
all the firearms that he purchased in New Hampshire at a house
in Braintree, Massachusetts to individuals who "were just there"
and who he could not identify (a claim that we found not to be
credible). LEBRON became familiar with the residence as he used
to purchase marijuana there from "Friz" often, who he has known
since approximately 2011.  Further investigation confirmed the
address of this residence to be 51 River Street, Braintree,
Massachusetts. I determined the identity of "Friz" to be Frankie
Wright with the assistance of local police agencies familiar
with the individual and his street name, and his connection with
the 51 River Street address identified by LEBRON.  Shortly after
this post-arrest interview, LEBRON notified us through counsel
that he did not wish to speak with ATF any further or to
cooperate on his case.

26.   Pursuant to the search warrant executed on September 17,
2018, one of the photos I located on LEBRON's cell phone was a
picture of a Walther 9mm pistol which appeared to be sitting on

his leg and inside of his bedroom, bearing the serial number
"FAJ3367." Braintree and Taunton Police Departments,
Massachusetts, executed two (2) search warrants on residences
associated with Frankie Wright in June, 2018. Among other
firearms and ammunition, a Walther 9mm semi-automatic firearm
was located bearing serial number "FAJ3367" at 51 River Street,
Braintree, Massachusetts. A Walther gun box bearing serial
number "FAJ3367" was also located at the residence of Frankie
Wright, 103 Hart Street, Apartment #1203, Taunton Massachusetts,
corroborating LEBRON's post-Mirandized statements and account of
firearm sales to Frankie Wright.

27.    Taunton Police Department, Massachusetts, also located a
black Palmetto Arms, AR-style rifle, with tan-colored magazines,
and an obliterated serial number during the execution of a
search warrant at 103 Hart Street, Apartment #1203, Taunton
Massachusetts, the residence of Frankie Wright. Taunton Police
Department provided me with a photo of the seized rifle from
Wright's residence. I located several photos of a black Palmetto
Arms, AR-style rifle, with tan-colored magazines in LEBRON's
cell phone. In one photo, LEBRON is pictured holding the rifle.
Both the seized rifle and the cell phone photos of the rifle in
LEBRON's cell phone have the same black "x" markings on the
bottom corner of the tan magazine. Other identifying features of
the rifle, to include the rail and the sights, in LEBRON's

possession appear the same as the rifle seized from Wright's residence, further corroborating LEBRON's post-Mirandized statements and account of his firearm sales.

28.   Other items observed inside LEBRON's residence included drills and a soldering iron that LEBRON stated he purchased for the sole purpose of allowing purchasers of guns he had for sale to obliterate the serial numbers on the firearms. Multiple photos of the firearms located on LEBRON's cell phone show firearms with obliterated serial numbers. The rifle located by Taunton Police Department at the residence of Frankie Wright also had an obliterated serial number.

29.   LEBRON said that he created an email address specifically and only for his armslist.com firearms transactions. The email address that he created was MLBSOX9402@gmail.com. LEBRON stated that he had not deleted any emails in that Google (Gmail) account documenting his armslist.com interactions.

### SEARCH WARRANT ON LEBRON'S GOOGLE EMAIL ACCOUNT

30.   On November 19, 2018, I obtained a federal search warrant for LEBRON's Google (Gmail) account associated with the email address MLBSOX9402@gmail.com.

31.   Pursuant to the search warrant, on November 27, 2018, I received digital copies of emails associated with MLBSOX9402@gmail.com, among other account data. A review of the emails provided to me associated with the email address

MLBSOX9402@gmail.com, showed that the account was strictly used for communicating with armslist.com advertisements and planning firearms transactions, corroborating LEBRON's post-Mirandized account of his firearms dealing.

32.   Ongoing investigation and review of LEBRON's incoming and outgoing emails indicate that LEBRON purchased at least thirty-three (33) firearms via verified transactions through armslist.com postings. The total number of purchased firearms via armslist.com is unknown at this point, however, may be greater than thirty-three (33) upon completion of the investigation. All confirmed armslist.com firearm sellers associated with the thirty-three (33) purchased firearms were interviewed and able to identify LEBRON as the buyer. All sellers confirmed that the sales took place in New Hampshire, corroborating LEBRON's post-Mirandized statement.

<u>ANAYLSIS OF LEBRON'S CELL PHONE</u>

33.   The call log saved in LEBRON's cell phone showed that he communicated with contacts saved as "Kimbo" and "Kimbo Trap" frequently via both voice calls and video calls between the dates of June 25, 2018, and August 6, 2018. Under the name "Kimbo," LEBRON saved the phone number 857-334-8558.  Under the name "Kimbo Trap," LEBRON saved the phone number 617-602-5025. LEBRON communicated with those contact numbers forty-three (43) times during this six week period, and did not communicate

before or after the aforementioned time-span.

34.    During that time-span LEBRON's phone history shows that he
inputted addresses into the Waze navigation application for
approximately eighteen (18) different locations in New
Hampshire, where he is known to have made his firearm purchases
through armslist.com.

35.    I inputted the phone number associated with the saved
contact listed as "Kimbo" into Lexus-Nexus Accurint database
which provided a subscriber named LAKIM COLLINS. Records checks
on COLLINS reveal him to have an active Massachusetts Driver's
License bearing the address of 40 Deckard Street, Apartment #2,
Boston, MA and that he has no licenses or permits to own or
carry firearms in Massachusetts, which absence also precludes
him from being licensed to deal in firearms by the ATF.  The
contact number associated with the saved contact listed as
"Kimbo Trap" could not be identified with a specific name.
Based upon my training, experience, and information provided to
me by other agents, a "trap phone" is commonly associated with a
prepaid phone that is often used to conduct secret or illegal
activities, keeping that communication separate from a
subscribed cellphone.

36.    Between June 25, 2018, and August 6, 2018, the time-span
in which LEBRON communicated with COLLINS via the contacts
listed as "Kimbo" and "Kimbo Trap," ongoing examination into

LEBRON's email account confirmed that he purchased at least
nineteen (19) firearms in New Hampshire, the last of which took
place on August 9, 2018, three days after LEBRON's last
identifiable phone contact with COLLINS. The following timeline
highlights the relationship between LEBRON's communication with
COLLINS and LEBRON's confirmed firearm purchases:

- June 25, 2018: LEBRON made 2 outgoing calls to COLLINS and
  received 1 incoming call from COLLINS. The same day LEBRON
  purchased 1 Smith and Wesson pistol in New Hampshire.

- June 25 – July 18, 2018: LEBRON purchased 7 firearms in New
  Hampshire.

- July 18, 2018: LEBRON made 4 outgoing calls to COLLINS and
  received 4 incoming calls from COLLINS. The same day LEBRON
  purchased 1 Springfield pistol and 1 Glock pistol in New
  Hampshire.

- July 19, 2018: LEBRON purchased a Taurus pistol in New
  Hampshire.

- July 20, 2018: LEBRON made 3 outgoing calls to COLLINS and
  received 5 incoming calls from COLLINS.

- July 26, 2018: LEBRON made 1 outgoing call to COLLINS and
  received 1 incoming call from COLLINS. The same day LEBRON
  purchased 1 Glock pistol in New Hampshire.

- July 27, 2018: LEBRON made 1 outgoing call to COLLINS and

received 3 incoming calls from **COLLINS**. The same day **LEBRON**
purchased 1 Glock pistol in New Hampshire.

- July 28, 2018: **LEBRON** received 4 incoming calls from
  **COLLINS**. The same day **LEBRON** purchased 4 Glock pistols in
  New Hampshire.

- July 31, 2018: **LEBRON** made 8 outgoing calls to **COLLINS**. The
  same day **LEBRON** purchased 1 Glock pistol and 1 Taurus
  pistol in New Hampshire.

37.     An incident records check through the Boston Police
Department indicates that officers responded to 24 Weybosset
Street, Mattapan, MA, on July 24, 2018 for a verbal argument
where a Navaeh Johnson got into a verbal argument with **COLLINS**
due to the fact that Johnson's parents wanted **COLLINS** out of the
house. **COLLINS** had left the residence prior to the arrival of
officers.

38.     The location history saved in **LEBRON's** cell phone showed
that he inputted 24 Weybosset Street into the Waze navigation
application on June 3, 2018. Prior to **LEBRON** entering the
address 24 Weybosset Street into his navigation, he purchased a
Ruger revolver in New Hampshire on May 27, 2018, and purchased
seven (7) Glock firearms in New Hampshire in the month of April.
On July 31, 2018, after the July 24, 2018, verbal argument where
Johnson's parents wanted **COLLINS** removed from the residence,
**LEBRON** inputted 40 Deckard Street into the Waze navigation

application. 40 Deckard Street is **COLLINS'** residence as listed
by the Massachusetts Registry of Motor Vehicles (RMV). As
mentioned previously, that same day, July 31, 2018, **LEBRON**
purchased 1 Glock pistol and 1 Taurus pistol in New Hampshire.
Also previously mentioned, **LEBRON** purchased six (6) Glock
pistols days before, between July 26 and July 28, 2018.

39.    A reliable Confidential Informant (CI)[1] provided me with
information that **COLLINS** associates himself with firearms and
individuals known to be in possession of firearms.  The CI
explained that he/she has seen video phone communication in the
last year (but could not be more specific as to when), where
**COLLINS** has been present with others who are in possession of
firearms.  The CI described the firearms that he/she has seen
during this video as being "Glocks."

### COLLIN'S USE OF THE TARGET LOCATION

40.    On November 5, 2018, I and other Agents established
surveillance at 40 Deckard Street (Target Location #1). At
approximately 3:05 pm a silver Volkswagen Passat bearing

---

[1] The CI agreed to cooperate with Law Enforcement after ammunition
was recovered from him and is seeking consideration on that
offense. On previous occasions, the CI accurately identified and
corroborated events and individuals involved in active criminal
investigations.  At the direction of law enforcement, the CI has
acquired and provided law enforcement a firearm as evidence of a
criminal investigation. The CI has a single group of criminal
convictions (that all appear to have arisen from a single
incident) that resulted in convictions for Armed Robbery and
Assault with a Dangerous Weapon.

Massachusetts license plates #9FZ697, arrived and parked in front of 40 Deckard Street. The driver of the Passat was positively identified as COLLINS by comparing him to his Massachusetts RMV photograph. COLLINS was wearing a red hooded sweatshirt, blue jeans, and his hair was fashioned in short braids. COLLINS exited the Passat with a dark colored backpack, walked to and entered into the passenger side of a Toyota Camry. RMV records list the owner of the Passat as CHRISTA HALLETT (a.k.a. CHRISTA WEATHERS, DOB: xx/xx/74, 40 Deckard St, Boston, MA). City of Boston online assessing records classify the residence at 40 Deckard Street #2 as a second floor residential condo unit in a three story/three family building. The owner is listed as CHRISTA WEATHERS.

41.   At approximately 3:10 pm, a blue Volkswagen Tiguan, MA license plate #3XK787, arrived and parked in the school parking lot across the street from 40 Deckard Street. RMV lists the owner of this vehicle also as CHRISTA HALLETT.  HALLETT exited the Tiguan, walked across the street and stood on the sidewalk next to the Camry. HALLETT communicated with COLLINS who was still seated in the Camry. HALLETT then walked to and entered into the building at 40 Deckard Street. At approximately 3:15 pm, COLLINS, carrying his backpack, exited the Camry and returned into the Passat. COLLINS then drove away from the neighborhood.

42.   At approximately 3:27 pm, I and other Agents observed the return of the silver Volkswagen Passat. COLLINS was still driving.

He backed the car into the driveway to the right of 40 Deckard
Street. He exited the car, ran diagonally across the street, and
entered into the passenger seat of an awaiting black Jeep Cherokee.
At approximately 3:31 pm, COLLINS exited the Jeep, and ran into the
building at 40 Deckard Street. At approximately 3:33pm, COLLINS
exited the building, walked to the Passat (in the driveway), opened
the passenger side rear door and removed the dark colored backpack.
He then walked back to and reentered the black Jeep. At
approximately 3:35 pm, COLLINS exited the black Jeep, returned to
the Passat, placed the backpack in the rear seat, reentered the
driver's seat, and drove away from the area. I observed that there
was a second person in the front passenger seat of the Passat.

43.   At approximately 3:56 pm, COLLINS returned to the area in the
sliver Passat, parked in front of 40 Deckard Street, exited the car,
and entered into the building. Two minutes later, COLLINS exited the
building, reentered and repositioned the Passat closer to the curb.
He again got out of the vehicle. A female passenger exited the front
passenger seat of the vehicle. She was wearing a black colored head
wrap, dark jacket, and striped sweat pants. Both COLLINS and the
female entered into the building.

44.   At approximately 4:10 pm, COLLINS and the female exited the
building, reentered the Passat, and drove away from the
neighborhood. I and other Agents followed behind. I followed the
Passat to the American Legion Shopping Center in the Roslindale

neighborhood of Boston, where the vehicle appeared to enter into the McDonald's drive-thru. Agents lost sight of the vehicle and could not relocate it in the parking lot. The plaza is in close proximity to 24 Weybosset Street.

45.     At approximately 5:25 pm, I observed the arrival of the silver Volkswagen Passat, MA plate # 9FZ697. COLLINS was driving. COLLINS parked several doors down from 40 Deckard Street and got out of the vehicle. COLLINS was wearing a dark colored backpack and carrying a red colored drawstring backpack. The dark backpack appeared to be the same backpack COLLINS carried the previous week. COLLINS walked to the common entrance door at the front of his building. Above the door handle is a keypad, which illuminates red when accessed. COLLINS appeared to enter a PIN code, which unlocked the door and allowed him access into the building. Approximately 30 seconds later, the lights went on in the second floor room that overlooks the front of the building.

46.  On November 26, 2018, at approximately 4:00pm Special Agent Daniel Campbell observed COLLINS arrive at 40 Deckard Street in the silver Passat and enter into the building.[2]

## USE OF RESIDENCES AND VEHICLES BY THOSE
## POSSESSING ILLEGAL FIREARMS

47.  Based on my experience, training, and information provided

---

[2] On other dates (most recently this morning), Agents have seen the silver Passat parked in the vicinity of 40 Deckard Street.

to me by other agents, I know that individuals who own and possess firearms normally possess and maintain them for long periods of time because firearms are somewhat expensive and do not easily wear out. In my experience and training, firearms are unlike narcotics or currency, which are often used or exchanged soon after being obtained. Firearms are similar to tools that a resident buys and maintains. Persons who own and possess firearms generally keep them in their residences unless they have a specific reason to bring them out such as for sale or to use in which case the firearms are often kept on the person or stored inside a vehicle for easy access.

## USE OF CELLPHONES BY THOSE
## POSSESSING OR DEALING IN ILLEGAL FIREARMS

48. Based on my experience, training, and information provided to me by other agents, I also know that individuals who buy, possess or sell illegal firearms often use cellular telephones to acquire or sell illegal guns. Cellular telephones are normally maintained them for reasonably long periods of time because they are expensive, can often be subject to long-term contracts that contain substantial penalties for early termination, can store large amounts of information, and do not easily wear out. In my experience, many individuals upgrade their phones periodically and often transfer the contents of the previous phone and use them to communicate with others (including individuals from whom they are

buying or selling guns) via email or text message.As already
noted, **LEBRON** communicated with **COLLINS** via cell phone forty-three
(43) times between the dates of June 25, 2018, and August 6, 2018
via voice and video calls with the contacts saved as "Kimbo" and "Kimbo
Trap." Cell phones also have text message and camera capabilities, and
many users tend to store photos in their cell phones which are most
often maintained by the user on his person or in his residence when not
outside.

### UNLOCKING AN APPLE DEVICE USING TOUCH ID FEATURE

49. Given the popularity of Apple brand devices and the
information and documents obtained from Mason, I believe it is
likely that I will find Apple brand devices such as an Apple
iPhone at one or both of the Target Locations.

50.  I know from my training and experience the experience of
other agents with whom I have spoken, and from information
found in publicly available materials including those published
by Apple, that some models of Apple devices such as iPhones and
iPads, offer their users the ability to unlock the device via
the use of a fingerprint in lieu of a numeric or alphanumeric
passcode or password.   This feature is called Touch ID.

51.   If a user enables Touch ID on a given Apple device, he or
she can register up to 5 fingerprints that can be used to unlock
that device. The user can then use any of the registered
fingerprints to unlock the device by pressing the relevant

finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.   Users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

52.   In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

53.   The passcode that would unlock any Apple device(s) found

during the searches of the Target Locations is not presently known
to law enforcement. Thus, it will likely be necessary to press the
finger(s) of the user(s) of the Apple device(s) found during the
searches to the device's Touch ID sensor in an attempt to unlock
the device for the purpose of executing the search authorized by
the requested warrants. Attempting to unlock the relevant Apple
device(s) via Touch ID with the use of the fingerprints of the
user(s) is necessary because the government may not otherwise be
able to access the data contained on those devices for the purpose
of executing the requested search warrants.

54.   The person who is in possession of a device or has the device
among his or her belongings at the time the device is found is
likely a user of the device. However, that person may not be the
only user of the device whose fingerprints are among those that
will unlock the device via Touch ID, and it is also possible that
the person in whose possession the device is found is not actually
a user of that device at all.            In some cases, it may not
be possible to know with certainty who is the user of a given
device, such as if the device is found in a common area of a
premises without any identifying information on the exterior of
the device. Thus, it will likely be necessary for law enforcement
to have the ability to require any occupant of the Target Location
to press their finger(s) against the Touch ID sensor of the locked
Apple device(s) found during the search of the Subject Premises in

order to attempt to identify the device's user(s) and unlock the

device(s) via Touch ID.

54.  Based on these facts and my training and experience, it

seems likely that COLLINS may possess an Apple device and that

his fingerprints are among those that are able to unlock those

devices via Touch ID.

## ITEMS TO BE SEIZED

55. Based upon all of the information I have obtained during the

course of this investigation, and for the reasons more

specifically set forth above, I submit that there is probable

cause to believe that evidence regarding LEBRON's illegal firearm

possession and trafficking will be found in the Target Locations.

More specifically, I submit that there is probable cause to

believe that the items described in Attachment 2 to this affidavit

will be present at the Target Locations and should be subject to

seizure because they will be evidence of a crime, contraband,

fruits of a crime other items illegally possessed or property

designed for use, intended for use or used in committing a crime.

## CONCLUSION

56.  Based on the foregoing, and based on my training and

experience, I submit there is probable cause to believe that the

premises located at 40 Deckard Street, Apartment #2, Boston, MA

(Target Location #1), which is more specifically described

above, presently contain the items described in Attachment 2 to this affidavit, and that those items constitute evidence of a crime, contraband, fruits of a crime, other items illegally possessed, or property designed for use, intended for use, or used in committing a crime within the meaning of Federal Rule of Criminal Procedure 41(c).

ROBERT JACOBSEN
SPECIAL AGENT, ATF

Sworn and subscribed to before me this 25 day of January, 2019.

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

*Case No. 19-5037-JGD*

## ATTACHMENT 1--PROPERTY TO BE SEARCHED

### TARGET LOCATION #1

Target Location #1 is 40 Deckard Street, Apartment #2, in Boston, Massachusetts. 40 Deckard Street, Apartment #2 is a residential condominium unit on the second floor of a three (3) story, three (3) family condominium building. It is located on the right side of Deckard Street, a one-way street. Boston Latin Academy is located across the street from 40 Deckard Street, on the left. The building is made of red brick. There are two concrete steps leading to the front door of the apartment building. The front door is light brown with a clear glass window in the center. The building number, "40," is located above the front door to the building.

The apartment to be searched is Apartment #2, located on the right side of the second floor. According to the City of Boston assessing records, the unit is divided into a total of five (5) rooms, including three (3) bedrooms, and one (1) bathroom. A photograph of 40 Deckard Street appears below.



Case No. 19-5037-JGD

## ATTACHMENT 2

### Description of Potential Items to be Seized

Evidence of a crime, contraband, fruits of a crime, other items illegally possessed, or

property designed for use, intended for use, or used in committing violations of 18

U.S.C. Sections 922(a)(1), or 922(g)(1) including, without limitation:

1. Any and all firearms, ammunition, ammunition feeding devices, cartridges, cartridge cases, original boxes for firearms, holsters, cleaning kits and supplemental firearm devices such as silencers and/or laser sights or any other items related to firearms.

2. Books and papers reflecting debts and collections relating to monies owed or due for the purchase or sale of firearms or ammunition; and records relating to income and expenditures for the purchase or sale of firearms or ammunition which were generated during the period from June 25, 2018 to September 6, 2018;

3. Photographs of firearms or ammunition or of persons in possession of firearms or ammunition;

4. Books, records, receipts, notes, ledgers, paper copies of emails or text messages and other papers relating to the acquisition or sale of firearms or ammunition which were generated during the period from June 25, 2018 to September 6, 2018;

5. Cell phones and all of their digital contents, including text messages, call logs, address boxes, e-mail inboxes, records of Internet activity, location information, and software (or applications) used; voicemails, photographs, and videos relating to the acquisition or sale of firearms or ammunition and which were generated during the period from June 25, 2018 to September 6, 2018;

6. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the acquisition or sale of firearms or ammunition;

7. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Locations including but not limited to canceled mail, deeds, leases, rental agreements, photographs, utility and telephone bills, identification documents, and keys;

8. During the execution of the search of the Target Locations described in Attachment 1, law enforcement personnel are authorized to press the fingers (including thumbs) of **LAKIM COLLINS** to the Touch ID sensor of any Apple cellular phone found at the Target Locations for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant if they have reasonable

suspicion that **COLLINS** is a user of the device.  The fingers to be used shall be chosen only by the searching law enforcement personnel.

9. During the execution of the search warrant, law enforcement personnel shall be entitled to seize any cellular phone if they have reasonable suspicion that **COLLINS** is a user of the device so that it may be searched off-site and then to return it to the owner as set forth below.

10. Nothing in this warrant shall authorize the search or seizure of any computer or computer related equipment (other than a cellular phone for which they have reasonable suspicion that **COLLINS** is a user of the device) without further order of the Court.

## RETURN OF SEIZED CELLULAR TELEPHONES

If the owner of the seized cellular phone requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting any seized cellular phone, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the cellular phone will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If a cellular phone cannot be returned, agents will make available to the phone's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all cellular phones seized pursuant to this warrant for as long as is necessary for authentication purposes.